Good morning. Next case is number 23-1950, number 23-1951, number 23-1952, Kendra O'Brien against New Jersey Division of Child Protection and Permanency. Mr. Kopicki. Good morning and may it please the court. My name is Corey Kopicki and I represent the appellants. I'd like to reserve three minutes for rebuttal. Granted, seizing children from their parents is among the most drastic actions the state can take. That's why courts throughout the country, including this one, have clearly established that social workers conducting child abuse investigations cannot seize children without a court order or enter a home without a warrant unless exigent circumstances exist. And this court held in 1989 that the concept of exigent circumstances in this context was well established. It means that a child is in eminent danger and that immediate action is needed to alleviate it. Here, defendants violated this clearly established law. Your complaint says that they entered involuntarily, correct? That's correct. Why isn't that a conclusory allegation that runs into Twombly and Iqbal? What facts do you have? Clearly, the sense I got from reading the papers was that your client's significant other felt sort of put upon and sort of felt like he had to open the door, right? Yeah, I think that's correct. But what facts do you have? I think, yeah, the facts are there. Because a lot of times the answer is, well, like, show me a warrant. If you don't show me a warrant, you're not coming in. Yeah, I think the facts we point to there, there are multiple times where, you know, Flanders explicitly says that he does not want them to come in the house. He specifically said they're not allowed to enter. Then they insist on multiple occasions that he has to let them in. They're there to investigate a child. Point us to the facts in the complaint so that if you accept for a minute my representation or my assumption that the word involuntarily isn't enough under Twombly and Iqbal, point us to the facts in the complaint that we can sort of focus on to show that this was actually a forced intrusion into the house. I think the key fact is that the complaint says Flanders physically barred her entry. He physically bars her entry into the home. Just read for us what you have. Do you have the complaint? I don't have a complaint in front of me, but I do know that it says that Flanders physically barred her entry into the house. Well, he physically barred, OK, initially, but then he didn't. I mean, there's nothing in the complaint to say that when he physically barred her that she punched him, kicked him, pushed him. There's nothing right. I mean, I think there's certainly a lot here. I mean, he only relents after repeated claims of lawful authority, telling him that he has no choice, that she has to enter. I mean, this is really exactly what happened in good. I mean, in good. So that's verbal. That's verbal sort of suasion or verbal berating. Right. And that's how does that make it involuntary? I mean, I mean, there was no consent and it wasn't voluntary because it only came after threats that after claims of lawful. Clearly, if you're barring some if I'm barring someone at the front door from entering my house. Yes. And then I stop barring them. And they walk in. That sure seems like consent. I think it depends on the facts on the ground on the case, but. Right. Exactly. It does depend on the facts. And that's why I'm asking what facts can you give us? The physical barring, repeated denials of entry, and then the fact that entry comes only after multiple claims of lawful authority. And Ash tells Flanders that he has no choice. She has to let him enter. And again, this is exactly what happened in good. And the Supreme Court has been clear in this court has been clear that when consent comes only in response to multiple claims of lawful authority, it's invalid. And I mean, here, I mean, based on the facts, Ash entered the O'Brien family home based on nothing more than a call from someone saying that Flanders was upset and agitated when he dropped the children off at school hours earlier. So for purposes regarding good and the submission to lawful authority, what are the facts in the in the complaint regarding the the I guess imprimatur of lawful authority? I think it's the direct statement that you have to let me and you have no choice. I'm here to investigate a child abuse investigation. I received a call from the school. So the identification as the state actor combined with the. Yes. And I think it's the identification of the state actor, repeated claims of lawful authority to enter. And I mean, the fact that we have a physical barring of the entrance and it's only after a back and forth multiple times, you have no choice. You have to let me enter. You have no choice. I'm here as the state to investigate child abuse allegations. Can I ask you regarding people's what facts plausibly allege a relationship between him and the children such that he has a constitutional liberty interest in the care, custody and management of the children? Yeah. And we recognize that the analysis might be different for grandparents. And we're not here saying that grandparents always have a protected substance due process interest. But we we think that in this case, when the grandparent is acting in a sort of parental capacity, I mean, the school calls people to pick the kids up. The state calls people to pick the kids up. People's attends a custody hearing. We think that's more like a sort of an emergency contact slash supportive, you know, which is great. The supportive parent for him is O'Brien. But what what facts specifically. Plausibly allege that he has a quasi parental relationship such that he has a constitutional liberty interest in the care, custody and control. Again, I think it would have to be the fact that they are repeatedly calling upon him to care for the kids. He's picking the kids up, you know, at various points throughout all the allegations and the complaints. He's acting in a bit of a parental capacity. He's always there. He clearly cares deeply for these kids. About a nanny. Right. You might be able to say the same. But regardless, even if this court doesn't want to go down that line, we still have multiple plaintiffs here that clearly have standing, have a protected liberty interest. We think. Could you answer the same question then for Mr. Flanders vis-a-vis the non-biological children? You know, obviously this the infant, but what facts in the complaint? We are only pursuing the claim for Flanders on behalf of his biological. Yeah, I think on the Fourth Amendment issue here, Jimmy, the state conceded the issue below that there was a Fourth Amendment violation. And Ash didn't even choose to assert the defense of qualified immunity when really all that they do is rely on the special needs doctrine. But the special needs doctrine is entirely inapplicable. That doctrine permits routine programmatic. It shows where they conceded there was a violation of the Fourth Amendment. I know they conceded that Fourth Amendment issue was raised. At J.A. 121, 122, they concede that they stated a claim for the Fourth Amendment and Ash chose not to assert a defense of qualified immunity. Well, that doesn't mean there was a violation. That just means you stated a claim. I mean, you get over the pleading her. Yeah, we're only on a motion to dismiss here. All right. But but but then she didn't argue qualified immunity. Right. But that doesn't mean she can't later argue qualified immunity. And that's right. We don't rely on that in our brief. You know, we completely take that head on. That's why I think that like all day, they I guess they don't really dispute here much of much of the facts about the Fourth Amendment. I think it's fair to say that they represent that brief, that this was a warrantless entry. And there was no doubt that there was not permission to enter. I really think what they fall back on is just a special needs doctrine. And they say that because of the special needs here, they were allowed to go in. But I mean, that is the exact argument that this court already rejected in good. I mean, even even assuming the special needs doctrine applies, even which is usually in the context of whether or not there is a policy of some sort. I mean, there doesn't seem to be a policy here. But even then, there's individualized assessments of whether in that situation, the the individual facts fit the policy. There doesn't seem to be a policy here. But in any case, it always comes down to the reasonableness. So whether or not the special needs or not, it's a reasonableness question, I guess. And so for purposes of qualified immunity, what how would you characterize for purposes of qualified immunity, the more specific right at issue in the Fourth Amendment here? I think it's exactly as this court said in good social workers conducting child abuse. Investigations cannot enter a home without a warrant unless they reasonably believe that the entry is necessary to prevent eminent harm and that the entry is going to alleviate that harm. And I also would say on the call, I want to make a point of qualified immunity. I mean, we don't need a factual case on all fours. And I think good is pretty close. But I mean, this court has noted that it takes a broad view of what constitutes an established right. And this court has had no problem to find the right at a far higher level of specificity than what we propose here. In Pinkney, this court defined the right as the right not to be arrested without probable cause. In Curley v. Clem, this court essentially defined the right as the right to be free from unreasonable seizures. And that makes sense. I mean, really, the key inquiry of qualified immunity, it's not to hunt through the case on an endless search for a factual dead ringer. It's simply to ask, based on these facts, would a reasonable official have known that this is unlawful? I see you have a little bit of time, so I want to ask you. I'm having trouble understanding what the difference is between the procedural due process and the substantive due process aspects of count three, as they both seem to assert the same constitutional interest, the liberty interest in the care, custody and management of the children. And they both seem to want the same process, which is pre deprivation process, absent imminent danger. So what is there a difference? I think there absolutely is a difference. And that's what tell me what the difference is that what process are you saying was required under procedural process and what is required under substance? I mean, what process is required stems entirely from procedural due process. The substantive due process prong just has a different constitutional test. And because that right there, what the court's looking at is what the action, you know, arbitrary or conscious shocking. So it's harder to violate the substantive due process test because that test bakes in reasonable suspicion of past abuse or eminent danger. Whereas the procedural due process test mirrors the Fourth Amendment. They can see this in their briefing. I think so. It's just the standard overview. The standard is different. So it's it's harder to violate substantive process. But nevertheless, we think that they certainly violated both here. I mean, as alleged, there's absolutely nothing to suggest that the children were in imminent danger when they were seized from the maternity ward of a hospital. It's surrounded by caring medical professionals and peacefully bonding together after just welcoming a new member of their family to the world. We nearly at your position. Even you note in your brief that the district court relied upon facts that were outside of the complaint. And that does seem to be the case. Is that your position, even considering those facts or disregarding those facts? That's my position, even considering those facts. I want to touch on that for a second. The district court's key mistake was not necessarily its analysis. It was that it inappropriate, relied on facts outside the complaint and adopted the defendant's framing. For example, the district court operated under the assumption that Flanders had an assault charge and a weapon charge at the time of the seizures. That's false. The assault charge comes months after the seizures, so it can't be used as a basis to justify them. And I'm not aware of any weapons charge against Flanders. Is there a warrant? So that that's in the complaint that's brought up. They say that there was a warrant for his arrest. The officers go back and check. There is no warrant. He gets arrested on August 16th only because he forgot to charge his ankle bracelet. He violated the terms of his probation, which he received for the child endangerment charge. If I could just clear this up for one second. I mean, the only history that Flanders has at the time of the seizures stems from a single incident where he inappropriately disciplined his son with a belt. After that, he pled guilty to the child endangerment charge and took responsibility. Then Cumberland County dropped the case against him. That's it. There is no assault charge at the time of the seizures, and I'm not aware of any weapons charge. I mean, at the time of the seizures, he was there is a child endangerment conviction. There is a child. He pled guilty to a child endangerment conviction related to a different child. That's not involved at all in the complaint is that I mean, I mean, she says they say in the complaint that he had an issue about disciplining a child and that the case was dropped. So it sounds like you're getting a little bit outside of the complaint. Yeah. I mean, if you're drawing all reasonable inferences in our favor, I'm not even sure you can say from the allegations in the complaint that he actually had an endangerment charge. The complaint says he had charges, but it doesn't say as a conviction of a pled guilty. It also later says he had a bracelet, which implies a conviction, but doesn't say for what conviction. Yes. And I don't see certainly the defendants, the appellees did refer to documents that were in the supplemental appendix when this case was still pro se on appeal. But that document is not before the district court and appears to be a complaint and not anything that actually I mean, can we take judicial notice of anything in that document? I don't see how this court could because it's not even facts. Those are allegations from a different complaint that was filed in New Jersey State Court in 2017. And I didn't see anything in the record. We could take judicial notice of the document being filed. We just can't accept as true the contents thereof. Correct. And I don't and I think but the only relevance it has here is for the contents that are within it. So I see him. I have time. One quick question. Did the district court address which of the claims did the district court address as to the to the Department of Child Welfare? I mean, this has a really complicated procedural history. This case actually started with Judge Samandel. Then he ended up saying that there wasn't subject marriage jurisdiction. It went up to the Third Circuit. It got remanded. Then it was before Judge Hellman. In that opinion, Judge Hellman only addressed a substantive process claims. He didn't address the procedural due process or Fourth Amendment. I think that's very understandable because it was pro se briefing at that time. It was a messy record. I definitely think it's understandable how he missed that. But yes, as we stand here today, no district judge has actually even addressed the Fourth Amendment claim or the procedural due process. But it's your I'm guessing it's your request that we address all of the claims now, despite that the district court hasn't passed on them in the first instance. Yes, we I mean, we think that they have clearly violated clearly established constitutional law and this court can address it. But regardless, at the very minimum, we ask this court to remand and at least let a district judge address this in the first instance, based on the allegations in the complaint. All right. I hear you on rebuttal. Thank you. Shelton. Good morning, Your Honors, and may it please the court. This court should affirm the district court's decision below granting the state's motion to dismiss because the defendants are entitled to qualified immunity. Qualified immunity is a dispositive issue in this case because the plaintiffs failed to demonstrate that a constitutional right was violated and that that right was clearly established law. More specifically, this court should affirm the opinion for three reasons. First, the district court correctly concluded that plaintiffs failed to state a claim that either her substantive due process or procedural due process rights were violated. For substantive due process, nothing alleged in the complaint demonstrates the defendant's actions were arbitrary or shocked the conscience, which was a necessary requirement under this court's opinion in Mulholland. There's no constitutional right to be free from a child abuse investigation. For procedural due process, the facts as pled in the complaint demonstrate that exigent circumstances were present necessitated the removal of the children from Miss O'Brien's custody. And this is consistent with the Fifth Circuit's decision in Gates. Could I direct your attention to the fact that what we were just discussing, that the district court did rely on facts that were outside of the complaint, and it explicitly relied upon those facts when articulating the right at issue in its qualified immunity. So for instance, it said that she was suicidal, that she self-mutilated in June, that these were convictions, not charges, that Mr. Flanders was on probation, and also noted underlying facts of Mr. Flanders' case, none of which were in the complaint. So I'm just wondering, can we even rely on the articulation of the right for qualified immunity purposes? She also ignored the assertion that the agreement was coerced, which was another fact that she stated. Wait, am I saying, should I be saying he? Anyway, sorry, he, that he relied upon. And that seems like something, at least at the complaint stage, that had to be construed in favor of the plaintiff given Croft. So I guess I'm just wondering what we can say about the right that was considered and whether we can rely upon the articulation of that right. So going to the verified complaint that was filed back in August of 2017, yes, those included allegations that plaintiff, quote, wanted to kill her boyfriend, terminate her pregnancy, suicidal ideation. But when you're talking about that, that's the complaint in state court. Yes. So why would we take note of any of those facts? So that complaint that was filed in state court was included in plaintiff's original pro se appendix as Exhibit 2. So they put that pro se appendix on appeal. Yes. So they put that before this court. Before this court, but it wasn't before the district court. And we're reviewing the district court's order on a motion to dismiss, which was based on the complaint before the district court. Correct. So even putting that aside, if we look at just what's in the four corners of the complaint, these additional facts are just superfluous. There's still enough within the complaint to assert the qualified immunity. So the entire portion of your brief that talks about qualified immunity relies on facts that were not before the district court. So I don't see any argument that the facts that actually were before the district court in the plaintiff's complaint that she filed in the district court did not state a claim and were not, you know, under clearly established federal law or because there's a lack of clearly established federal law. Because the bottom line, as she said, to the district court, I had a family agreement where Mr. Flanders was not supposed to be with the kids alone. And then the district court said something other than that. And so on and forth. So right now we have a situation where drawing all inferences in the plaintiff's favor, like she had Mr. Flanders was doing what he was allowed to be doing. And these three small children, including an infant who was just two days old, were taken away from their mother. So based on those facts, why are your clients entitled to qualified immunity? So if we look at the complaint with respect to the family agreement, the plaintiff's acknowledged that DCPP was unaware of the so-called revised family agreement. Right. She says she had a revised family agreement that did not say Mr. Flanders couldn't live in the house. Instead, it said he could not be the sole caregiver for the children. So if I look at if we look at paragraph 94 of the verified complaint defendant. Sorry. Paragraph 93. She refers to this second family agreement. Paragraph 94. She acknowledges that defendant rule states he knows nothing about any secondary agreement. And so under under defendants rules belief at the time that this removal was taking place, the first family agreement was the operative agreement. And that agreement prohibited Mr. Flanders from being around the children. And so with that, you're saying that because the agency that is responsible for enforcing a family agreement, their employee of that agency was ignorant of the fact that there was an updated agreement. Then they therefore had the right to take these children away from their mother. I'm saying that they were at the time that this removal took place. They were under the impression that the first agreement was the operative agreement. At this stage, we don't know if the second agreement was the valid one or the first. But we do because because this is that's a standard of review. We have to credit her allegation that the second agreement was actually in place. Yes. But we also have to credit the allegation that the defendant state of mind at the time was that there was only that first family agreement that was relevant. Even if there was a first family agreement reasonably in the mind of Mr. Rolls, how does that show imminent harm to the children? It shows imminent harm to the children because we have an individual, Mr. Flanders, who, again, in the mind of the DCP defendants at the time that this was happening, had a record of a documented history of child abuse. But that's not in the complaint. I mean, the only thing that's in the complaint is that there was some sort of interaction with family services and that it had been resolved. There says there's charges. It doesn't say there's a conviction. And in any case, it seemed that the state can't rely on the family agreement in light of Croft and the complaints assertion that the agreement was coerced. Well, it's not solely reliance on the family agreement. It's reliance on what DCPP found underlying the need for the family agreement. And that might be the case after, but it seems all the facts you're stating are outside of the complaint. Well, in the complaint, the plaintiff does acknowledge that Mr. Flanders had this prior history of child abuse. Well, it just says he had a case for disciplining his child. I mean, I understand that outside of the complaint, there was, in fact, an actual charge and a conviction and probation. There's some intimation of an ankle bracelet in this complaint. But the complaint itself just says there was a disciplinary issue that had been cleared up. Now, again, you know, maybe outside of the complaint, this is a very different picture. But right here right now, we're just on the facts of the complaint, which I've read very carefully. And everything you're saying to me so far are assumptions based on assertions that the state made in its response, but are not actually stated in the complaint. So if we're just looking at what was stated in the complaint, paragraph 57 plaintiff acknowledges when Mrs. O'Brien asks questions as to why this is to be, Ash states Mr. Flanders has a history of violence and hurting his child. So that knowledge was present in the DCPP employee's mind at the time. That was what was pled in the complaint. So based on that information, whether or not the charge was shroud, whether or not there was an actual conviction, DCPP at the time that they visited the home had knowledge that Mr. Flanders had a history of violence and hurting his child. And so that was enough to justify the visit to the home and then subsequently remove the children from Miss O'Brien's custody. Do you ask us to take judicial notice of anything else like the conviction or? Yes, but I would also say even without that additional information outside the complaint, if we just look at what was put in the complaint alone, there was enough information for DCPP to enter the home. Do you have anything else besides paragraph 57? 58, where Miss O'Brien acknowledges that she knows about the history of Mr. Flanders. The history of his recent child abuse was referenced multiple times throughout the complaint. And so you're saying it doesn't really matter whether he had a conviction or not. I mean, what matters is that the mother of his child, according to the complaint itself, says he has a, quote, history of child abuse. Yes. And we're looking at two different moments in time here. At the time that the DCPP employee entered the home, there was enough information. Like I said, she doesn't need to know whether or not there was a conviction or not. She has information to justify the fact that he has a history of child abuse. And that information isn't from the neighbor who they don't get along with or, you know, it matters. It matters that it's actually from a loved one and the mother or someone he's romantically involved with. Yes. And to further elaborate on that, the phone call that initiated this visit to the home came from a school. So if the school was concerned enough to make a phone call to DCPP to tell them that, hey, you need to check in on these kids, this father came to pick up their children. He was agitated. He very flustered. That's essentially DCPP's job. They can't receive a phone call from a school that, hey. Why is it imminent when he's removed while the children are being interviewed? He, meaning Mr. Flanders, is arrested. And then again, I'm just going off the complaint. He's arrested while the children are still in the custody of DCCP being interviewed. Three hours later, Mr. Peoples is told they're not going home. They've been removed. So the removal, at least per the complaint, is after Mr. Flanders has been detained. And then the infant is taken the next day. So why is there imminence when he's in custody? Again, just confining ourselves to the complaint. Why is there imminence when three hours before the children's removal, he's been detained and a full day? So the imminence, just because the facts that led to Mr. Flanders' documented history of abuse happened months prior to the actual removal, doesn't mean that they can't be... But he's in custody, so he can't be in the home. That's what I'm asking. If he's the danger, how is there imminence when he's detained? And the complaint states that he was still in custody when he appeared for the hearing on the next day. Yeah, so when it comes to the removal, we're looking at the totality of the circumstances. So Mr. Flanders' presence is only one of several factors. We're also looking at the environmental neglect. So the key, if you have no process, no pre-deprivation process, isn't the key imminence? What's the imminence? So again, that's just one factor. Other factors include the environmental neglect. And so as you can see... But for pre-deprivation without process, it has to be imminent. Isn't that clearly established? Yes. And so what I'm trying to say is the imminency is a result of also the environmental neglect. So in the complaint, there were allegations that the home was not safe for the children. There were roaches. There were bedbugs. There wasn't a working stove. They didn't have a bed to sleep in. Regardless of whether Flanders is gone from the picture, you're saying this was not a home suitable for an infant to return to. Correct. And so that also contributed to the imminency analysis. And so regardless of whether Flanders is there, their home is still not suitable for children. And so it was necessary to make sure that they weren't returning to that home in those conditions. And he was taken into custody because they thought he had an outstanding warrant. Is that right? That's correct. And was that not true? I think your friend on the other side suggested that he didn't really have an outstanding warrant. I believe that's what they pled in the complaint, but it's not clear. He was taken into custody, but it's not clear as to whether or not there was a legitimate warrant. So paragraph 133 of the complaint says there was no warrant. So you agree that we we accept that at this point? Yes. But again, the imminency was not just based on Mr. Flanders' presence. There was also... But they discovered it in June, and they didn't remove the children in June. So in June, when the environmental neglect was discovered, shortly thereafter, the kids were... They went away for the summer. They went to Ohio. They were staying with their biological father in Ohio for several months. And the complaint does say that. Yes. So in June, throughout the summer, there was no imminent need to remove them because they were not present in that home. They were not around Mr. Flanders. They were away out of state in Ohio with their biological father. Well, the complaint says they were in the home the day the inspection was done, but that Ms. O'Brien told... I think it was Ms. Ashe who was there, that the children were about to go to Ohio for the summer. So, I mean, it does say it's very soon, but even if it's the next day, it wasn't imminent enough to remove them before the next day. So the visit to the home was on June 6th, the... At which time they didn't do the inspection because Mr. Flanders protested. Right. And on June 6th, Defendant Ashe visited the home. Yes. On June 6th, Defendant Ashe visited the home, and all she did was to look to see if the children were okay. Flanders did not permit her to actually inspect the home. Should we infer anything? If Flanders did not permit her to inspect the home then, and later Flanders let her in, do we infer anything from that on the Fourth Amendment issue that it wasn't in fact a compulsory entrance or forced entrance into the home, but rather consent? Correct. It could be inferred that there was consent to enter the home based on the way the facts are appended in the complaint. But even if this court does not agree that there was consent there, the Special Needs Doctrine justifies the warrantless entry, as was... Tell us exactly what the special needs were at the time of that entry. Sorry, could you repeat the question? Sure. Tell us exactly, you know, you mentioned the special needs exception. That's a legal principle that is an exception to the warrant requirement. Tell us what facts in this case support the efficacy of the special or the application of the special needs exception. Yes, so the facts of this complaint were that on June 6, the school was concerned enough to make a phone call to DCPP about Mr. Flanders' condition or state of mind or character traits, that he was flustered and that he was frustrated and aggravated when he came to pick up the children. And so because the school entity that has experience with dealing with children in relation to children and parents thought that it was important enough to make a phone call to DCPP, it's essentially the core of their job when they get a report... All right, but that's not enough to enter someone's house. So the question was... You need more than that. You need more than, hey, we got a phone call from teachers saying that this guy is dysregulated. So, again, in the complaint, Ms. Ash never inspected the home at the time. She just wanted to see the children to make sure that they were okay. Right, right. But I'm talking about the entrance into the home. She needed to enter the home to see that the children were okay. That's all she wanted to do was to go in there. As soon as she saw them, she left. There was no searching of the house or anything like that. She got a phone call. And to add to that, also in the complaint, it was acknowledged that Mr. Flanders was told that he could not leave with the children, but he did so anyways. And so DCPP should have viewed the children at the school. But because Mr. Flanders took them home, they had to appear at the house to view the children. So it's not that they felt the need to go into the house specifically. The issue was that they needed to view the children to make sure that they were okay. Had Mr. Flanders not done what he was not supposed to do in removing the kids from the school, they would have been able to go to the school to see that the children were okay. But because he took them home against what they said that he was permitted to do. All right. So your argument, as I understand it, is that in a circumstance where someone who dropped kids off at school is emotionally dysregulated enough to have the school call DCCP, and there's a directive made by DCCP for him not to take children from school, and he disobeys that order or that directive, that's enough for DCCP to forcibly enter the home to check on the children under the Special Needs Doctrine? It's enough for DCPP to go to the home to see the children. And in the event that the guardian or parent or whomever is prohibiting them from being able to do their job, then yes, that's when the Special Needs Doctrine kicks in. Okay, got it. So clearly they had not only the right, but the obligation to go to the house and check on the kids. Yes. And what should happen is, hey, I'm here to check on the kids. The adult brings the kids out. The kids stand on the porch or whatever, and everything looks copacetic, and then DCCP goes away. Or you have a conversation. But your argument is that when the response is, no, you can't check on the kids, get out of here, then the special needs exception is triggered, and you have to go in. That's correct. Okay. And just to think about this in a broader implication, it's like if DCPP gets a credible report of abuse or neglect, they have to go to the home and check. That's at the core of what their job responsibility is. If they do not do so and something happens to the child. I think the key word you just said is credible. And it's not that you're not positing some reasonable inferences. It's just that at this stage, we have to read the complaint in the light most favorable to the plaintiffs. And I think there are other inferences that can be drawn. I guess your use of the word credible or that there's an objectively reasonable ground for imminence, which still, even if it's credible, there still has to be, without pre-deprivation or pre-entry process, there has to be imminence. I mean, I think that is clearly established in our law. So I guess what I'm still coming down to is even if there is, I see what you're saying about the duty. Yes. And that being frustrated, but it still seems that the key here is the imminence. And so I would say that the practical implication of requiring a warrant for each and every one of these scenarios would be detrimental to the child in the event that they truly were in danger. And that's essentially why the special needs doctrine exists. It's the need divorced from law enforcement to protect the health and safety of a child when there's reasonable suspicion that they could be in danger. And so when, as is the case in this case, and as was pled in their complaint, when a school is calling a social worker agency and saying, hey, you need to come to this school to take a look at these kids, their father's here. He tried to pick them up. And he's in this agitated condition. Maybe that may not rise to the level of probable cause. But again, when you're dealing with trying to... I didn't say probable cause. I said reasonable, objectively reasonable grounds for imminence. Yes, I would say it's objectively reasonable to believe that when the school takes the step to actually call DCPP and say, hey, this man came to pick up his kids or dropped off his kids, I think is when the call came in. And he was in this agitated state. He was frustrated. I think that is sufficient for DCPP to go to the home. And again, based on the facts, that was not their first step. Was the imminence created by his refusal? Yes. So the fact that the school took the initiative to make this phone call and the fact that he took them after the school said, no, you cannot, that was enough for DCPP to have reasonable suspicion that these children could be in the face of harm. Just want to clarify. You keep talking about the special needs doctrine. The special needs doctrine has been only applied in areas where suspicion is beside the point. The Fourth Amendment's warrant requirement is what deals with suspicion and a basis for research. So the special needs doctrine is about random drug testing of students and suspicionless seizures at border crossings. But you're saying that we should apply the special needs doctrine to say that it supplants the Fourth Amendment's warrant requirement when there is enough suspicion. No, even without the suspicion. So the point that I'm trying to make is because of the special needs doctrine, you don't even need that same level of suspicion that would be required. But then you're saying, well, but we have enough suspicion so that there were special needs. The special needs doctrine, the Supreme Court has been pretty clear that is separate from any level of suspicion. It allows searches in very special circumstances regardless of suspicion. And you're saying this is one of those circumstances because there was suspicion. So I'm saying that if we do, if this court does not want to apply the special needs doctrine and wants to rely on a reasonable suspicion analysis, then I would say that the facts as planned in the complaint do provide the objectively reasonable suspicious analysis there. But alternatively, if this court is willing to entertain that the special needs doctrine does apply, then we don't have to look at suspicion at all. Based on the special needs doctrine, the DCPP has an interest that is completely divorced from law enforcement to check on the children, to enter the home, to make sure that the children were not subject to harm. All right. Thank you very much, Ms. Shelton. We'll hear rebuttal. Thank you. Mr. Kopicki, before you start, I just want to try to clean something up. You were very helpful about telling us Flanders' interest, people's interest. The sheriffs, they're out of the case, it seems. We are not pursuing a Monell claim. So the sheriffs are out. Okay. So the sheriffs are out. We still do have the seizures related to the children to the extent the sheriffs are involved. But we are not pursuing any Monell claim. And we also recognize that that seizure was caused by DCPP as well, so the court has to address it. We haven't technically dropped that claim. I'm sorry. I'm confused. Are the sheriffs mostly out of the case, totally out of the case? Where are they? They are only in to the extent that they are involved with the actual seizures of the children from the hospital. We are not pursuing any Monell claim. Okay. That means you're pursuing individual claims against the sheriffs for removing the children from the hospital. That's it.  And obviously DCPP is connected with those seizures and was the driving force behind those seizures. We just haven't technically dropped the claims against the sheriffs in their individual capacity. Okay. But the district court dismissed this to them too. Yes. So where in your brief did you say that the district court made a mistake? Where in your appellate brief did you say that the district court made a mistake in dismissing the sheriffs? I think that's bound up with our seizure argument. We also do drop a footnote saying that the sheriffs aren't excused simply because they received the Dodd papers. Our view is that the sheriffs have their own independent obligation to conduct an eminence analysis. And the sheriffs are also empowered to make Dodd removals. So they really have no excuse for not being familiar with the Dodd Act. Can I try that again?  Where in your appellate brief did you say that the district court erred when it dismissed the sheriffs from the case? I don't have my appellate brief in front of me. But I think we tied it up. I didn't see it. We're not pursuing the Monell claim. But they're out of the case completely in the district court. Try to stay with us. So the district court says the sheriffs are out, right? Yes. Okay. So then if you think the district court made a mistake in saying the sheriffs are out, what happens is you file a brief in our court and you say, the district court erred when it said the sheriffs are out for this reason or that reason. And I'm asking, did you ever do that? Because if you didn't, then it's a forfeiture. Yeah, so the district court did analyze these on two separate matters. I'm not asking what the district court did. I'm asking what you did in this court. Yeah, I mean, we recognize that the analysis might be different. We thought that in our appellate briefing. I didn't read your brief to assert that there was any mistake regarding the sheriffs. You don't seem to make any assertions at all about the sheriffs vis-a-vis the removal. I didn't either, and that's why I'm asking you. I'm trying to give you an opportunity to show that I somehow missed something in your brief, and what I'm getting is deflection. So are the sheriffs in or out? And if the sheriffs are still in, you need to point to your appellate brief and show us where you argued that the district court made a mistake in dismissing them. The district court's analysis was functionally the exact same with the sheriffs, aside from the Onell claim in the seizures. So we think that's valid. But point to the point in your brief. I don't have the page reference directly in front of me. I can't recall it offhand, but we understand the analysis might be different. And I would like to go into some other points on rebuttal related to the social workers, if that's all right. You can do whatever you want. I'm trying to get some help, and what I'm getting is your answer is you don't have the complaint handy. I mean, you don't have the brief handy. You don't have the brief handy. Okay, go ahead. There's also no Onell claim for DCCP. We are not pursuing any Onell claim. We are not pursuing any Onell claim. All right, let me try another question. Why isn't this case more like Mamaro than Croft? I think Mamaro is easily distinguishable. Mamaro involved multiple allegations of abuse from multiple people supported by multiple positive drug tests. We don't have anything like that here. I mean, as alleged. Here we actually have a complaint that says that the father has a history of child abuse. That's more substantial, isn't it? I don't think so. I mean, Pointers is one man who made one mistake one time. He took responsibility for his actions. I'm not saying he couldn't change. What I'm saying is that if you work for child services and you get a call from someone that says we're concerned about these children and the children are being driven around and under the custody of someone who has already had a history of child abuse. I would like to address that point. That would require some looking into it. I don't think that's a fair read into the complaint. At the time of the warrantless home entry, if that's what we're talking about, there's absolutely no indication that they know about his history. DCPP talked to the social worker. I mean, talk to O'Brien in the hospital after the warrantless home entry, as alleged in the complaint. The only thing that I said is that they received a call from someone saying that Flanders was upset and agitated when he dropped the kids off at school hours earlier. And on top of that, right. And then did they leave? And then did they say anything about Flanders not picking up the kids based on that information? No, I mean, there's nothing in the complaint about this. It just says that all we know that they received a call from someone saying that Flanders was upset and agitated. When he dropped the kids off at school hours earlier. After that, as alleged in the complaint, then they go to the hospital to talk to O'Brien. And that's when they learn about the history under the allegations in the complaint. And that's apparent. But Flanders' only claim is about the biological child. And that happened after O'Brien told them at the hospital about his history, right? I mean, yeah. I just simply don't think it could be the state of the law that any time someone has some past criminal history, they're no longer allowed to be near their biological child. Clearly, clearly not. I don't think that's what your friend on the other side is arguing. What she's arguing is that when they go to the hospital and they're aware of all the facts in the complaint, including O'Brien telling them about his history, then further investigation is required. I mean, sure. We don't. They should have went to the house. They should have knocked on the door, had a conversation. That would have been enough. But I relate to the season. But what about the hospital? As alleged, absolutely nothing supports the notion that the children were in imminent danger when they were seized from the hospital. I mean, they were all peacefully bonding together, surrounded by caring medical professionals, after just walking their newborn children into the world. And I'd like to really point out, everything that they point to to justify the seizures had been known for months. They point to O'Brien's house and her mental health, yet they required her to care for the kids alone in that exact house. The kids didn't go to the highway immediately after on June 7th. It's not clear from the complaint. It seems that they stayed there for a couple of days. They point to Flanders' history, yet that history involved only one mistake, and he now has a relationship with his son. And finally, they point to the breach of the family agreement, but that was obtained through coercion, and it wasn't even breached under the allegations in the complaint. I mean, every single thing that they point to happened either months before the seizure or months after the seizure. And this is really critical. The only thing that happened at the time of the seizures that's a new fact is that the family agreement was purportedly a breach. But in their appellate briefing, they specifically say that the breach of the family agreement had absolutely nothing to do with the seizures. They disclaim that because they realize they can't rely on it in light of Croft. I mean, at bottom, everything that they rely on happened months before and months afterwards. That simply cannot support an eminence analysis under the state of the law, and that's apparent. All right. Thank you, Mr. Kopicki. Thank you, Ms. Shelton. The court will take the matter under advisory.